## 17206

MARGARET W. MACAULAY, Appellant, v. JOHN HOWARD and BERTHA F. HOWARD, Respondents

(94 S. E. (2d) 393)

Charles *W. McTeer, Esq.*, of Chester, *for Appellant,*

Messrs. *E. K. Hardin*, of Chester, and *M. D. Douglas*, of Winnsboro, *for Respondents,*

September 20, 1956.

TAYLOR, Justice.

This appeal arises out of an action brought by appellant in the Court of Common Pleas for Chester County for possession of a house and lot located in the City of Chester. Respondents, by way of answer, set up ownership under deed of a third party, adverse possession, and alleged certain improvements and betterments for which they sought to be indemnified in the event appellant was adjudged owner of said property. The case was tried before a Judge and jury at the December, 1955, Term, resulting in a verdict for respondents; and appellant contends error in that, first, the trial Judge refused to direct a verdict for the appellant where the only reasonable inference to be drawn from the testimony was that appellant was owner of the property involved and that there was no testimony to support the issue of equitable estoppel; second, that the trial Judge erred in ruling that respondents were not liable to appellant for a reasonable rental for use and occupancy of the property and failing to submit this issue to the jury; third, that the Court erred in charging the jury that appellant had a cause of action against respondents' grantor.

John G. White died testate on July 13, 1944, owning certain real estate in the City of Chester, South Carolina, as shown by certain exhibits admitted into the record. He devised certain lots, including Lot No. 18, the one in question, as shown on exhibit, to appellant and other lots within the near proximity were devised to his son, E. M. White. E. M. White, however, went into possession of Lot No. 18 immediately after the death of his father, John G. White, and retained possession thereof until conveyed by deed of June 4, 1948, to respondents, who have been in possession since.

During the course of trial, respondents gave notice that they were relying upon the doctrine of equitable estoppel, and the Court ruled that there was no question but that the appellant had title to the property if she had not lost it by estoppel. One who relies upon the defense of equitable estoppel must carry the burden of proof of such plea; *Raleigh & C. R. Co. v. Jones,* 104 S. C. 332, 88 S. E. 896; *Davis v. Sellers,* 229 S. C. 81, 91 S. E. (2d) 885.

"The essential elements of an equitable estoppel as related to the party estopped are: (1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intention, or at least expectation, that such conduct shall be acted upon by the other party; (3) knowledge, actual or constructive, of the real facts. As related to the party claiming the estoppel, they are: (1) Lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped; and (3) action based thereon of such a character as to change his position prejudicially." 19 Am. Jur. 642.

In *Hubbard v. Beverly,* 197 S. C. 476, 15 S. E. (2d) 740, 741, 135 A. L. R. 1206, this Court used the following language:

"The doctrine of estoppel applies if a person, by his actions, conduct, words or silence which amounts to a representation, or a concealment of material facts, causes another to alter his position to his prejudice or injury. The citation of authority for this well established postulate of law would only be a work of supererogation.

"In the case of *Ott v. Ott,* 182 S. C. 135, 140, 141, 188 S. E. 789, 792, Mr. Justice Bonham, now Chief Justice, quoted with approbation from 10 R. C. L. 697, 698, the following: ' "The final element of an equitable estoppel

is that the person claiming it must have been misled into such action that he will suffer injury if the estoppel is not declared. That is, the person setting up the estoppel must have been induced to alter his position, in such a way that he will be injured if the other person is not held to the representation or attitude on which the estoppel is predicated. Furthermore, an equitable estoppel cannot arise except when justice to the rights of others demands. It was never intended to work a positive gain to a party." ' "

Respondent Bertha Howard testified that she had put a fence on the property during the life of the testate. Respondent John Howard testified that he married Bertha Howard in 1945, and at the time Bertha was renting the house from Mr. Floyd White; that after their marriage he rented the house from a Mr. Neely, a real estate agent; that he put a fence on the property after he purchased it and that he bought the property for $1,350.00, paying for it mostly in monthly installments and that he made improvements thereon, that he neither consulted an attorney nor made any investigation of the title at the time of purchase.

Mr. George White, brother of appellant, testified that he collected rent for his father during his lifetime; that after the death of his father, John G. White, he cut the plat of the property in half and gave to appellant that part showing the lots devised to her. E. M. White testified that George gave him his half of the plat and that the street was the dividing line between his and appellant's property; that he took over the house and lot involved from his brother, Floyd, and that he sold the house and lot in question to respondents.

Respondents in their brief rely principally upon and quote the following testimony as sufficient to sustain their position relative to equitable estoppel:

"Q. Now, Mrs. Macaulay, when did your father die? A. 1944.

"Q. When did you first discover that this property was yours and what were the circumstances? A. In 1954 I was

getting ready to plant little pine trees on the area over in Brooklyn that I own that was not used, and I went over— I got this old plat of mine out and went over to walk over the land so as to be sure I planted the pines on my own territory, and I saw that this lot No. 18 which I would see as I would drive into Edward St., directly at the end of Edward St., was on my part of the plat, but that there was a lot not in my possession. I wasn't getting any rent for the house on that lot.

"Q. All right, go ahead. A. And so I did look into the matter, of course, I talked to the defendants who were occupying the house and they said that they had bought the lot in 1948, June, I believe, and then I kept on making some inquiries about this lot and some study into the matter and came to the conclusion that it was Lot No. 18 given to me by the will of my father.

"Q. Have you *see* this plat, Plaintiff's Exhibit No. 3, before? A. Yes, that is my half of a plat.

"Q. Do you recall when you got that? A. It was at the time of the settlement of my father's estate, and I think it was my brother, George E. White, who gave it to me. It contains the lot given to me which my father willed.

"Q. And can you locate the lot that you claim on that plat? A. At the head of Edward St. right there.

\* \* \* \* \*

"The Court: Did you know that the house was down there—just the physical fact that it was there? The Witness: Oh, yes.

"The Court: You had known it was there at the time you claimed you came into it under the will? The Witness: Well, I didn't go over and walk over my land. I didn't differentiate the lines.

"The Court: But you did know there was such a house there? The Witness: Oh, yes.

"By Mr. Hardin: Q. Now, Mrs. Macaulay, further you knew that there were at least 20 houses, I believe, that had been left to you and to your brother, didn't you? A. I don't know that I counted them.

"Q. Mrs. Macaulay, did you not know that your brother Edward went into possession of 11 houses and 15 lots? A. I guess I knew it, but I didn't take any notice of it. What he got was not my concern.

"Q. Well, now, Mrs. Macaulay, it may not have been your concern, but surely within the family each of you knew what the other got because did you not have numerous family councils concerning the property of your father's estate? A. Numerous, no.

"Q. Several, Ma'am? A. I don't know how many. Maybe two.

"Q. But at any rate the Howard house was never mentioned at any of those? A. No, sir, I don't think so.

"Q. But you have known that the house was there all of this time? A. Yes.

"Q. And you knew that you were not paying the rent? A. Yes, sir.

"Q. You knew that you were not selling any of your houses, but you knew that your brother Edward had sold his? A. I knew he was selling some of his. How many he was selling I didn't know.

"Q. Mrs. Macaulay, did Bertha Howard cook for your brother Floyd? A. Yes, sir.

"Q. You knew Bertha Howard was living in this particular house? A. Yes, sir.

"Q. Did you not also know Bertha Howard was not paying any rent to you? A. Yes, sir, I didn't know I owned her house.

"Q. Didn't you know that she was paying rent to your brother Edward? A. If I had thought about it, I would have. I didn't know it. I had no reason to ask that.

"Q. But you have known Bertha all these years? A. Yes, sir, before my father's death.

"Q. Yes, ma'am, and you have made no demands on her or no claims of any kind until you had the deputy sheriff serve the Summons and Complaint on her February 28,

I believe it was? A. Well, the point is, I didn't know that that property was mine until 1954 when I was looking into those lines."

From the foregoing, it is clear that appellant was not aware that the property was hers until 1954 when she became interested in establishing the line for the purpose of planting some trees and made inquiry of respondents.

There is a total lack of any testimony to the effect that respondents relied on any representation, acts, or nonacts of appellant or were misled in any way to change their position to their prejudice. Respondents did not have the title to the property investigated; had they done so they would have learned that the lot in question was devised to appellant by John G. White and that E. M. White had no interest therein.

For the foregoing reasons, we are of the opinion that ▪ the evidence was insufficient to sustain the plea of equitable estoppel and the question should not have been submitted to the jury.

Appellant also contends that the trial Judge should ▪ have submitted to the jury the issue of her rights to a reasonable rental on the property. There was no reference to this feature of the case in the trial Judge's charge and no ruling thereon. Appellant made no request for a charge thereon and having failed to call the Court's attention thereto, will not be permitted to raise this question for the first time in this Court; therefore, this question is resolved against appellant's contention.

The third question, which relates to the charge, becomes unimportant in that the case is being remanded for a new trial on other grounds; however, we might state that the record reveals that the jury was explicitly instructed to the effect that collateral matters were not for their concern.

There is testimony to the effect that respondents have ▪ expended considerable sums on taxes, insurance, and improvements for which they are entitled to be re-

imbursed. The judgment appealed from is, therefore, set aside, and the case remanded to the Court of Common Pleas for Chester County for the purpose of determining the amount, if any, due respondents as such.

Reversed and remanded.

STUKES, C. J., and OXNER, LEGGE and MOSS, JJ., concur.